UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

FLINTKOTE COMPANY, et al.,

        Plaintiffs,

    v.

AVIVA PLC, et al.,

        Defendants.

Case No.  15-cv-01638-SI

**ORDER ON TRUST PAYMENTS, APPLICABILITY OF A BOND, AND MOTIONS TO SEAL**

Re: Dkt. Nos. 119, 120, 122, 123, 125, 131, 135, 137, 139, 146

Before the Court are two motions filed by plaintiffs Flintkote Company and The Flintkote Trust (collectively "Flintkote"),[1] asking this Court:  (1) to order defendants Aviva PLC, Aviva International Insurance, Ltd., and The Ocean Marine Insurance Company Limited (collectively "Aviva")[2] to post a bond pursuant to California Insurance Code § 1616; and (2) to order Aviva to comply with its alleged contractual obligations to pay the liquidated value of covered asbestos-related injury claims to Flintkote.  Dkt. 120, 123.

Aviva filed its own motion regarding trust payments.  Dkt. 119.  Aviva's motion asks this Court for partial summary judgment concerning choice of law and Aviva's obligation to pay

---

[1] Recently Flintkote Company moved this Court to add The Flintkote Trust as a plaintiff. Dkt. 98.  This motion was granted.  *Flintkote Co. v. Aviva PLC*, No. 15-CV-01638-SI, 2015 WL 9269761, at *4-5 (N.D. Cal. Dec. 21, 2015).  For purposes of this motion, the Court will refer to plaintiffs as "Flintkote" unless specifically referring to The Flintkote Trust.

[2] Defendants are a series of entities identified as the successors to The Commercial Union Assurance Company Ltd. ("CU UK"), a London-based insurance company that issued asbestos liability insurance policies to Flintkote.  *Flintkote Co. v. Aviva PLC*, 2015 WL 9269761, at *2. Recently, defendants moved this Court to substitute The Ocean Marine Insurance Company Limited ("Ocean Marine") in place of Aviva PLC as the true defendant. Dkt. 97. This motion was denied, and instead Ocean Marine was added as a defendant.  Dkt. 107.  For purposes of this motion, the Court will collectively refer to defendants as "Aviva."

United States District Court
Northern District of California

Flintkote.   According to Aviva, its obligation under the policies at issue is limited to paying Flintkote for the amount Flintkote has actually paid, or does actually pay, to the asbestos claimants.  Dkt. 119-4 at 6.[3]  Aviva believes that California law governs this dispute.[4]  Dkt. 119-4 at 13-14.

For the reasons that follow, the Court DENIES Flintkote's motion for a declaration of the parties' rights regarding trust payments, GRANTS Aviva's motion for partial summary judgment, and GRANTS Flintkote's motion for a bond.

## BACKGROUND

The parties have a decades-long relationship consisting of multiple legal challenges in a multitude of arbitral, state, and federal fora.  *See Flintkote Co. v. Aviva P.L.C.*, No. CV 13-103-LPS, 2015 WL 1405922, at *1 (D. Del. Mar. 25, 2015).

In resolving the motions currently before this Court, the Court will:  (1) identify the parties, one of whom is The Flinktkote Trust; (2) examine the operation of The Trust; (3) examine the Wellington Agreement; (4) examine the 1989 Agreement (the operative agreement between the parties that was based on the Wellington Agreement); (5) examine the language of the policies at issue; (6) determine what law to apply to this contract dispute; (7) resolve and order the appropriate payment obligation; and (8) resolve the issue of whether a bond applies.

## I.      The Parties

The Trust is the result of Flintkote (and related entities) having filed a May 1, 2004 chapter 11 bankruptcy in the United States Bankruptcy Court for the District of Delaware.  *Flintkote Co. v.*

---

[3] The page numbers cited refer to the page numbers generated by ECF.

[4] Along with these motions, the parties have filed numerous motions to seal.  Dkt. 119, 122, 131, 135, 137, 139, 146.  The documents sought to be sealed discuss trial-level and appellate arbitral proceeding(s), which the parties have stipulated to keep confidential.  The Court GRANTS the administrative motions reflected in Docket Numbers 119, 122, 131, 135, 137, 139, and 146 at this time, but may request further briefing on whether and to what extent they should remain under seal. .

United States District Court
Northern District of California

*Aviva P.L.C.*, 2015 WL 1405922, at *1.   Prior to bankruptcy, Flintkote was a Delaware corporation, headquartered in California, that manufactured and distributed building materials containing asbestos fibers.   Dkt. 110 ¶ 1, 8; *see also Flintkote Co. v. Presley of N. California*, 154 Cal. App. 3d 458, 461 (Cal. Ct. App. 1984) (describing Flintkote as a material dealer in gypsum wallboard); *see generally Nelson v. Flintkote Co.*, 172 Cal. App. 3d 727 (Cal. Ct. App. 1985).

For purposes of this order,[5] Aviva is a London-based insurance company that issued asbestos liability insurance policies to Flintkote.   Dkt. 110 ¶ 12; *Flintkote Co. v. Aviva P.L.C.*, 2015 WL 1405922, at *1.

## II.      The Operation of the Trust

The purpose of The Trust is to channel all pending and future asbestos bodily injury ("ASBI") claims, then to administer, resolve, and pay those ASBI claims.[6]  *Id.*; *see also* Dkt. 121-3 at § 4.1.2.   The Trust will review and pay current and future ASBI claims pursuant to what are called "Trust Distribution Procedures," or TDPs.   Dkt. 121-3 at § 4.1.2.   The TDPs set forth procedures for processing and paying Flintkote's share of the value of the claims, with the intention of paying all claimants over time as equivalent a share as possible of the value of their claims.   Dkt. 121-4 at § 2.1.

Under the TDPs, a Flintkote asbestos claimant may seek to recover for one of seven "disease" categories, designated as "Disease Level I – VII."   *Id.*   Claimants who qualify for payment under the TDPs are to be paid a percentage of the nominal "value" The Trust assigns to their claims.   *Id.* at §§ 2.3, 4.1., 4.2, 5.1(c).   For example, the nominal "Scheduled Values" for

---

[5] *See supra* text accompanying note 2.

[6] The Trust recently achieved confirmation of its plan of reorganization pursuant to section 524(g) of the Bankruptcy Code.   According to the confirmation order and the plan's terms, the plan went into effect on September 30, 2015 and began paying ASBI claims.   Dkt. 110 at ¶ 29; *In re Flintkote Co.*, No. 04-11300 (MFW), 2015 WL 4762580 (Bankr. D. Del. Aug. 12, 2015). Section 524(g) is "unique to the asbestos context. It provides a mechanism for consolidating asbestos-related assets and liabilities of a debtor into a single trust for the benefit of present and future asbestos claimants. . . .  Section 524(g) authorizes the bankruptcy court to enter a 'channeling injunction'—channeling claims to the trust—to prevent claimants from suing the debtor." *In re Thorpe Insulation Co.*, 671 F.3d 1011, 1015 (9th Cir. 2012).

claimants electing the Expedited Review Process[7] range from $650 for asbestosis/pleural disease (Level I) to $184,000 for mesothelioma (Level VII).  *Id.* at § 5.3(a)(3).  Claims evaluated under the Individual Review Process are subject to "Maximum Values" ranging from $650 to $450,000.  *Id.* at § 5.3(b)(3).  Regardless of the nominal values assigned to a claim, The Trust's obligation to pay a qualifying claim is limited and determined by what is called the "payment percentage."  *Id.* at § 2.3, 4.1, 4.2.  For example, if The Trust assigns a claim a nominal value of $184,000 but the payment percentage is 8%, the amount that The Trust is obligated to pay the claimant is $14,720.  *Id.* at § 4.2, 4.3; *see also* Dkt. 121 at ¶ 10 (setting forth payment percentage).

The present dispute between the parties concerns what Aviva is obligated to pay Flintkote.  Aviva argues that its indemnity obligation is to pay the payment percentage or, as Aviva characterizes it, what The Trust "actually pays" to the asbestos claimants.  Dkt. 119-4 at 13; *see also* Dkt. 119-7 at 2.  Flintkote argues that Aviva must honor its pre-bankruptcy coverage obligations with respect to the ASBI claims and pay the full liquidated value of the claims, because according to Flintkote "it is a fundamental legal principle that an insurer cannot profit from the insolvency of its insured."  Dkt. 120 at 16.

Flintkote argues that recovering the full liquidated value amount from Aviva would ultimately lead to a greater recovery for claimants.  Flintkote highlights language in the TDPs that it contends would allow for this increased recovery.   The TDPs provide that:

> The Initial Payment Percentage shall be set . . . after the Trust is established by the Trustees, the Trust Advisory Committee ("TAC") and the Legal Representative for Future Asbestos Claimants ("Future Claimants Representative") . . . The Initial Payment Percentage will be calculated on the assumption that the Average Values . . . will be achieved with respect to existing present claims and projected future claims involving Disease Levels III-VII.  The Payment Percentage *may* thereafter be adjusted upwards or downwards from time to time . . . with the consent of the TAC and the Future Claimants Representative to reflect then-current estimates of the Trust's assets and liabilities, as well as the then-estimated value of pending and future claims.  . . .  *If* the Payment Percentage is increased over time, claimants whose claims were liquidated and paid in prior periods under the TDP *may* receive additional payments. . . .  Because there is uncertainty in the prediction of both the

---

[7] The Expedited Review Process, according to the TDPs, "is designed primarily to provide an expeditious, efficient and inexpensive method for liquidating all Trust Claims . . . where the claims can easily be verified by the Trust as meeting the presumptive Medical/Exposure Criteria for the relevant Disease Level." Dkt. 121-4 at § 5.3(a)(1).

United States District Court
Northern District of California

number and severity of future claims, and the amount of the Trust's assets, *no guarantee* can be made of any Payment Percentage of a Trust Claim's liquidated value.

Dkt. 121-4 at § 2.3 (emphasis added).

In other words, the TDPs contemplate that the payment percentage *may* change, as the initial percentage assumes a number of factors, such as the number of claimants, the types and number of diseases ranging in severity, and the available assets. And *if* the payment percentage does change, earlier claimants who were paid less *may* be entitled to a higher payment. Notably, the TDPs are careful to point out that *no guarantee* can be made of higher payment amounts. Section 4.2 of the TDPs provides that,

> No less frequently than once every three (3) years . . . the Trustees *shall* reconsider the then applicable Payment Percentage to assure that it is based on accurate, current information and *may*, after such reconsideration, change the Payment Percentage if necessary, with the consent of the TAC and the Future Claimants Representative. . . . The Trustees must base their determination of the Payment Percentage on then-current estimates of the number, types, and values of present and future Trust Claims, the value of the assets then available to the Trust for their payment, all anticipated administrative and legal expenses, and any other material matters that are reasonably likely to affect the sufficiency of funds to pay a comparable percentage of full liquidated value to all holders of Trust Claims.

Dkt. 121-4 at § 4.2 (emphasis added).

Flintkote seizes on the "shall" language italicized above and asserts that if it is able to secure additional revenue from insurers such as Aviva, "it *must* apply those proceeds to the benefit of claimants." Dkt. 120 at 27.

> In further support of this assertion Flintkote points to section 4.3 of the TDPs, which states:

> If the Trust successfully resolves an insurance coverage dispute or otherwise receives a substantial recovery of insurance proceeds, the Trust *shall* use those proceeds first to *maintain* the Payment Percentage then in effect. . . . *If* the Trustees, with the consent of the TAC and the Future Claimants Representative, make a determination to increase the Payment Percentage due to a material change in the estimates of the Trust's future assets and/or liabilities, the Trustees shall also make supplemental payments to all claimants who previously liquidated their claims against the Trust and received payments based on a lower Payment Percentage.

Dkt. 121-4 at § 4.3 (emphasis added); *see* Dkt. 120 at 27-28.

> Importantly, the above language mandates only that insurance proceeds must first go to maintain or stabilize the payment percentage. Contrary to Flintkote's representations, the Court does not interpret the above provision to mean that there is a direct "link between insurance

recoveries and claimant payments." Dkt. 120 at 28. It is clear that the Trustees still exercise discretion, based on a series of external factors, when deciding whether to adjust the payment percentage.

### III.     The Wellington Agreement, the Asbestos Claims Facility, and the Parallel Arbitration

In order to resolve what Aviva must pay Flintkote the Court must consider the original agreements entered into by Flintkote, as well as the policies at issue.

In the 1980s, Flintkote, like many other producers of asbestos products, was engaged in coverage litigation with general liability insurers. *See Flintkote Co. v. Gen. Acc. Assur. Co. of Canada*, No. C04-01827 MHP, 2008 WL 3270922, at *9 (N.D. Cal. Aug. 6, 2008). A large part of this industry-wide litigation ended when a number of parties reached a negotiated settlement, commonly referred to as the Wellington Agreement. *Id.* This accord, signed in 1985 by numerous manufacturers and their insurers — including Flintkote and some of its insurers, not including Aviva — resolved persistent contribution and indemnity issues, thereby allowing for joint representation in thousands of pending asbestos-related lawsuits. *Id.* The Wellington Agreement provided for the creation of the Asbestos Claims Facility to analyze, defend and settle pending and future asbestos-related bodily injury claims referred to it by participating former asbestos producers. *Id.* The Asbestos Claims Facility jointly defended its members until it dissolved in 1988. Dkt. 121 at 3; *see also In re Complex Asbestos Litig.*, 232 Cal. App. 3d 572, 581 (Cal. Ct. App. 1991).

Following the Facility's dissolution, Flintkote continued to defend its own claims. Dkt. 121 at ¶ 5. The Wellington Agreement continued to bind its signatories, despite the Facility's dissolution. *See generally* Dkt. 119-7. Currently, Wellington Agreement signatories (including Flintkote) are engaged in a parallel arbitration to decide, among other matters, virtually the same question presented in this dispute: whether insurers are obligated to pay Flintkote the full liquidated value of the claims, or the trust payment percentage. *Id.* at 2. The insurers in the arbitration are responsible for a share of the policies that are at issue in the present dispute; that is, Aviva subscribed to only a portion of the policies at issue here; the balance of those policies are

United States District Court
Northern District of California

6

being arbitrated in the parallel Wellington Agreement arbitration.  Dkt. 110 at ¶ 12, 13, 19, 23, 25.

The Wellington Agreement is important for the present dispute for three reasons.  First, its parallel arbitration provides insight into how an independent forum would resolve the same issue.  Second, the policies at issue do not contain a choice of law provision, so the parties (and the arbitrator in the parallel proceeding) have looked to the Wellington Agreement, which provides:  "All disputes concerning the validity, interpretation and application of the Agreement or the Appendices hereto, or any provision thereof, and all disputes concerning issues within the scope of the Agreement shall be determined in accordance with applicable common law of the states of the United States."  Dkt. 121-2 at § XXII(2); *see also* Dkt. 119-7 at 3; Dkt. 120 at 15.  Third, Flintkote claims that the 1989 Agreement between Flintkote and Aviva (as explained in more detail below) incorporated many of the Wellington Agreement provisions, including the choice of law provision, as well as the promise that "each Subscribing Insurer shall waive and permanently abandon and shall not assert or apply any conditions or defenses based upon, or exclusionary provisions contained in, insurance policies, which defenses or provisions have the effect of reducing or denying insurance coverage available[.]"  *See* Dkt. 121-2 at § VIII(5); *see also* Dkt. 120 at 9, 10, 20.  Flintkote supports this assertion by pointing to the 1989 Agreement's language of incorporation, which states that "[Aviva] shall afford to Flintkote all of the rights and obligations afforded to Subscribing Producers by Subscribing Insurers in the Wellington Agreement subject to the provisions of this Agreement.  All interpretations of this Agreement shall be consistent with interpretations of the Wellington Agreement as adopted by the Facility."  Dkt. 120 at 18 (referencing Dkt. 121-1 at Article IV.).

## IV.    The 1989 Agreement

Aviva did not immediately subscribe to the Wellington Agreement, but entered into a separate settlement agreement with Flintkote in 1989 incorporating many Wellington Agreement provisions ("the 1989 Agreement").  Dkt. 107 at 2; Dkt. 121 at ¶ 3; Dkt. 121-1.  The 1989 Agreement provided for litigation, as opposed to the Wellington Agreement's binding arbitration procedure, which partially explains why this dispute is pending in federal court.  Dkt. 107 at 2-3.

## V.     The History of the Present Filing

Flintkote has been litigating with Aviva for decades regarding the scope of coverage and the rights and obligations of the parties under the settlement agreement reached in 1989. *Flintkote Co. v. Aviva P.L.C.*, 2015 WL 1405922, at *1.   Flintkote filed for chapter 11 bankruptcy protection in 2004.  Dkt. 110 at ¶ 26; Dkt 121 at 3.  From 2006 to 2012, Flintkote and Aviva mediated their coverage disputes.  *Flintkote Co. v. Aviva P.L.C.*, 2015 WL 1405922, at *1. Following an impasse, on December 24, 2012, Aviva moved the Delaware Bankruptcy Court to lift the automatic stay imposed by 11 U.S.C. § 362(d), intending to file suit for declaratory relief in the Northern District of California.  *Id.*  One week before the scheduled hearing on Aviva's motion to lift the stay, Flintkote preemptively filed for identical declaratory relief in Delaware District Court.  *Id.*  Flintkote then filed a motion to compel arbitration.  *Id.*  Aviva filed a motion to dismiss or, in the alternative, to transfer venue.  *Id.*   The Delaware District Court granted Flintkote's motion to compel arbitration and dismissed as moot Aviva's motion for summary judgment and motion to dismiss or transfer.  *Id.*  The Third Circuit Court of Appeals reversed the district court's order.  *Id.*  Aviva thereupon renewed its motion to dismiss or transfer venue in the Delaware District Court.  *Id.*

The Delaware District Court examined the record and found that Flintkote engaged in an anticipatory filing that merited departure from the first-filed rule, *id.* at 2, which provides that "[i]n all cases of concurrent jurisdiction, the court which first has possession of the subject must decide it."  *See Crosley Corp. v. Hazeltine Corp.*, 122 F.2d 925, 929 (3d Cir. 1941).   In support of its departure from the rule, the court found that: (1) Flintkote "undeniably" had knowledge of Aviva's intent to file an action adjudicating the same issues in the Northern District of California; and (2) Flintkote first-filed in Delaware to avoid the California decision *Fuller-Austin Insulation Co. v. Highlands Ins. Co.*, 135 Cal. App. 4th 958 (Cal. Ct. App. 2006) ("*Fuller-Austin*") — a case adverse to Flintkote's interests which will be discussed in greater detail below.  *Flintkote Co. v. Aviva P.L.C.*, 2015 WL 1405922, at *5.  The Delaware District Court transferred this case to this

1    Court.[8]  *Id.*

2

3    **VI.    The Policies**

4        All of the insurance contracts at issue use substantively identical language in their insuring

5    agreements, stating that the subscribing insurers will: "indemnify the Assured for all sums which

6    the Assured shall be *obligated to pay* by reason of the liability . . . (a) imposed upon the Assured

7    by law . . . for damages on account of: (i) Personal injuries[.]"  Dkt. 125 at Exs. E-1 at

8    LON_052221; E-2 at LON_052371; E-3 at LON_052438; Ex. E-4 at LON_052701; E-5 at

9    LON_052866; E-6 at LON_052912; E-7 at LON_052972 (emphasis added).  The policies are also

10   "subject to the same terms, definitions, exclusions and conditions (except as regards the premium,

11   the amount and limits and except as otherwise provided herein) as are contained in or as may be

12   added to the Underlying Umbrella Policies[.]" Dkt. 125 at Exs. E-1 at LON_052222; E-2 at

13   LON_052372; E-3 at LON_052439; E-4 at LON_052703, E-5 at LON_052868; E-6 at

14   LON_052914; E-7 at LON_052974.

15       The underlying umbrella policies provide: "The Company will pay on behalf of the Insured

16   all sums which the Insured shall be *obligated to pay* . . . by reason of the liability imposed upon

17   the Insured by law . . . for damages on account of [A.] Personal Injuries[.]"  Dkt. 125 at Exs. E-8

18   at LON_053047; E-9 at LON_053078 (emphasis added).  The underlying umbrella policies further

19   provide that "[t]he Company shall only be liable for ultimate net loss in excess of . . . the limits of

20   the underlying insurance in respect of each occurrence covered by the underlying insurances[.]"

21   Dkt. 125 at  Exs. E-8 at LON_053074; E-9 at LON_053079.

22       "Ultimate net loss" is defined as: "[T]he total sum which the Assured, or any company as

23   his insurer, or both, become *obligated to pay* by reason of personal injury, property damage or

24   _____

25       [8] The Court observes that the Delaware District Court found it "unnecessary" and
     "premature" to "decide whether California law applies to the underlying insurance dispute, or how
26   the choice of law doctrines differ between California and Delaware."  *See Flintkote Co. v. Aviva
     P.L.C.*, 2015 WL 1405922, at *3 n.3.  The court was careful to point out, however, that "Flintkote
27   has identified California law as being unfavorable to its position, and seeks to avoid that forum in
     order to reduce the possibility that the adverse law will apply."  *Id.*

28

United States District Court
Northern District of California

advertising liability claims, either through adjudication or compromise[.]" Dkt. 125 at Ex. E-8 at LON_053051; see also Ex. E-9 at LON_053083-84 (emphasis added).

## VII.    Other Issues Not Decided By Present Order

Both parties seek guidance from the Court on what Aviva is obligated to pay Flintkote. Other collateral issues, such as whether the policies are "pay first" policies and the timing of the payment obligation, have not been fully briefed by the parties and will not be decided in the present order.  *See* Dkt. 120 at 13 (summarizing the parties' dispute and Flintkote's requested relief, not including a discussion of timing); Dkt. 148 at 12 (no meaningful discussion in Flintkote's reply brief); Dkt. 119-4 at 28 (Aviva devotes one paragraph of discussion to the issue). If necessary, the parties may seek resolution of these issues at a later time in a separate motion. Further, the Court agrees with the arbitrator in the parallel Wellington Arbitration, *see* dkt. 119-7 at 2-3, 5 n.4, that the questions of how the payment of defense costs impacts the remaining policy limits and whether certain trust expenses are covered defense costs, are issues for later resolution. *See also* Dkt. 135-5 (arbitrator's ruling on defense costs issue).  These issues are largely irrelevant to the "obligated to pay" issue.  Dkt. 137-4 at 7-8, 26; Dkt. 146-5 at 15-17, 19.

## LEGAL STANDARD

Choice of law determinations, as well as contract interpretation issues, are pure legal questions well-suited to summary judgment.  *See Shannon-Vail Five Inc. v. Bunch*, 270 F.3d 1207, 1210 (9th Cir. 2001); *TH&T Int'l Corp. v. Elgin Indus., Inc.*, 216 F.3d 1084 (9th Cir. 2000). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The moving party, however, has no burden to disprove matters on which the nonmoving party will have the burden of proof at trial.  *Id.* at 325.  The moving party need only demonstrate to the Court that there is an absence of evidence to support the non-moving party's case.  *Id.*

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Once the moving party has met its burden, the burden shifts to the nonmoving party to "set

2   forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that there is a

3   genuine issue for trial.'"  *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630

4   (9th Cir. 1987) (citing *Celotex*, 477 U.S. at 324).  To carry this burden, the non-moving party must

5   "do more than simply show that there is some metaphysical doubt as to the material facts."

6   *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  "The mere

7   existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the

8   jury could reasonably find for the [non-moving party]."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

9   242, 252 (1986).

10    In deciding a summary judgment motion, the Court must view the evidence in the light

11   most favorable to the non-moving party and draw all justifiable inferences in its favor.  *Id*. at 255.

12   However, conclusory, speculative testimony in affidavits and moving papers is insufficient to raise

13   genuine issues of fact and defeat summary judgment.  *Thornhill Publ'g Co., Inc. v. GTE Corp.*,

14   594 F.2d 730, 738 (9th Cir. 1979).

15

16                                              **DISCUSSION**

17    At their core, the competing motions addressing Aviva's obligation to pay Flintkote only

18   seek resolution of paragraph 35, subpart (i), lines 5-8 of Flintkote's second amended complaint

19   ("SAC"), which examines "whether the amount of Aviva's coverage obligation is based on the

20   liquidated value of the claim as determined by the Trust or the payment percentage amount the

21   Trust actually pays."  Dkt. 110 at 13.

22    Aviva styles its motion as one for partial summary judgment; Flintkote styles its motion as

23   one for declaratory relief.  Dkt. 120 at 7; Dkt. 119-4 at 5-6. The Court finds that the relief

24   requested is declaratory in nature and based on undisputed facts.  The parties do not dispute the

25   relevant facts at issue; rather, they dispute the law that applies to them and the application of that

26   choice of law to the facts.

27

28

United States District Court
Northern District of California

## I.  California Law Applies to this Contract Dispute

### A.  The *Fuller-Austin* Case

This Court must determine which law — California, Delaware, or some other — applies to this case.  In the pages which follow, the Court will evaluate the choice of law issues.  For clarity, however, the Court will provide at this point a description of the primary California case which the parties either desire to use, or desire to avoid, *Fuller-Austin Insulation Co. v. Highlands Ins. Co.*, 135 Cal. App. 4th 958 (Cal. Ct. App. 2006).[9]  *Fuller-Austin* examined the effect of an insured's bankruptcy under 11 U.S.C. § 524(g) on an excess insurer's payment obligations.  *Id.* at 966.  As in the present case, the court was tasked with deciding how to interpret policies that indemnified Fuller-Austin for amounts the insured was "obligated to pay" by law.   *Id.* at 997.

In reaching its decision, the court reasoned that "only section 524(g) permits an entity to shield itself from asbestos liability by diverting not only present, but also future or unknown claimants, to a limited fund for payment."  *Id.* at 996.  Pursuant to this bankruptcy shield, the court found that the liquidated value of the claims set by the Fuller-Austin Trust "serve[d] only as a model of what would be paid under the best case scenario, assuming that the payment sum percentage reached 100 percent."  *Id.* at 997.   The court determined that the trial court improperly relied on public policy considerations when it concluded that appellants were required to indemnify Fuller-Austin for the liquidated value amount set by the trust.  *Id.*   The court was careful to note that, "While premising appellants' indemnity obligations on the basis of a best case scenario may comport with a strong public policy to compensate victims of asbestos exposure, public policy may not be used to redefine the scope of coverage."  *Id.*  Instead that court held that the insurer's obligation was the payment percentage set by the trust — what the trust actually paid to claimants.  *Id.*  The court noted that there was no assurance in the plan and no requirement that the trustees would *upwardly adjust* the payment sum percentage on the basis of the trust's increased assets provided by the insurance proceeds.  *Id.* at 998.

---

[9] *Fuller-Austin* is the elephant in the room for the choice of law discussion.  Wikipedia, *Elephant in the Room*, https://en.wikipedia.org/wiki/Elephant_in_the_room (as of Apr. 4, 2016, 22:52 GMT).  *See also United States v. Yazzen*, 187 F. App'x 800, 802 n.1 (10th Cir. 2006).

Whether and to what extent the *Fuller-Austin* applies here will be considered at more length below.

## B.      Choice of Law Analysis

The parties appear to agree that the Wellington Agreement's choice of law provision provides the basis upon which the Court must adjudicate this dispute.  Dkt. 120 at 15; Dkt. 137-4 at 11.  That provision states: "All disputes concerning the validity, interpretation and application of the Agreement or the Appendices hereto, or any provision thereof, and all disputes concerning issues within the scope of the Agreement shall be determined in accordance with applicable common law of the states of the United States."  Dkt. 121-2 at § XXII(2).

Flintkote argues that this "applicable common law of the states of the United States" language should be interpreted to mean that this Court can rely on "generally applicable contract interpretation rules that apply to insurance policies."  Dkt. 120 at 14.  But as Aviva correctly points out, there is no such thing as a "national common law," a "federal general common law," or "prevailing law."  *See Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938) ("Except in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state. . . .  There is no federal general common law.").

Flintkote attempts to avoid this conclusion by arguing that there is no conflict of laws at all, as "every court faced with Flintkote's Policies, Agreements and circumstances agrees that the insurer must pay the full Liquidated Value."  Dkt. 120 at 14.  But a closer look at the cases cited in support of this argument reveals that only two federal trial courts, adopting a pre-*Fuller-Austin* approach as announced by the Seventh Circuit, have reached a contrary result.[10]  *See* Dkt. 120 at 13-14, 21-22; Dkt. 139-5 at 11.

The Seventh Circuit case was *UNR Indus., Inc. v. Cont'l Cas. Co.*, 942 F.2d 1101 (7th Cir. 1991) ("*UNR*").  UNR was a bankrupt asbestos manufacturer and Continental Casualty Company

---

[10] Flintkote also cites a Texas state court decision, *Swan Transp. Co. v. Highlands Ins. Co.*, No. D-1-GN-07-004027 (Travis Cty., Tex. D. Ct. 2010), but does not discuss it at all. Dkt. 120 at 21.

United States District Court
Northern District of California

("Continental") was its excess insurer. *Id.* at 1103-04. Notably, the court determined that state law — in that case, Illinois law — controlled the outcome of the dispute. *Id.* The court reasoned that, given its bankruptcy, UNR had suffered a "loss" within the meaning of the Continental policy. *Id.* at 1105. The court concluded that Continental could not pay UNR the payment percentage the UNR bankruptcy trust actually paid to claimants because such a result would run afoul of a bankruptcy provision contained in the policy and Illinois law. *Id.*

Following *UNR* was *ARTRA 524(g) Asbestos Trust v. Fairmont Premier Ins. Co.*, No. 09-CV-458, 2011 WL 4684356 (N.D. Ill. Sept. 30, 2011) ("*ARTRA*"). In *ARTRA*, the court found that the policy was governed by Illinois law and applied the holding in *UNR* to require the insurer to indemnify the insured for the "full" amount of the loss claimed rather than the "discounted" amount of the bankruptcy estate's payments. *Id.* at *1. In doing so the Court explicitly discussed how *Fuller-Austin* was "inapplicable to the present proceeding" because it was "a California court's application of California law." *Id.*

Most recently was the case *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Porter Hayden Co.*, No. CIV. CCB-03-3408, 2012 WL 734176 (D. Md. Mar. 6, 2012) ("*Porter Hayden*"). In *Porter Hayden*, the court was careful to discuss the application of Maryland law in reaching its conclusion. *Id.* at *1-*2, *4. The court also distinguished its decision from *Fuller-Austin*, noting that *Fuller-Austin* "[did] not have precedential value." *Id.* at *2.

Unfortunately for Flintkote, *UNR*, *ARTRA*, and *Porter Hayden* do not have precedential value in this Court either. This Court accords weight to the final, "Phase I" rulings of the arbitrator in the parallel Wellington Agreement proceedings,[11] who noted that he did not "see a reference to 'majority' rule in the [operative] words 'applicable common law of the states,' but

---

[11] The Court observes that Flintkote filed the arbitrator's *preliminary* views on the matter, representing that they were "the arbitrator's Memorandum to the File issued in [this] arbitration." Dkt. 139-2 at ¶ 4; Dkt. 139-4. In that preliminary document, the arbitrator determined that Delaware law was the applicable law to govern the dispute. Dkt. 139-4 at 3. In its oral argument before this Court, as well as in its briefing, Flintkote neglected to mention that in the *final* Phase I rulings the arbitrator clearly stated: "*Fuller-Austin* is not as easily distinguishable from the instant dispute as I thought when I provided counsel with a memorandum of my preliminary views shortly after the November hearing," ultimately concluding that "the rationale of the *Fuller-Austin* court's decision . . . is applicable here as well." Dkt. 119-7 at 4.

rather a requirement that [he] decide *which* state law applies." Dkt. 119-7 at 3 (emphasis in original). Notably, over a four-day hearing, the arbitrator determined that California law applies to that dispute. *Id.* at 2. He reasoned that California law "provide[s] the best fit for the facts and context of th[e] case," and cited the factors present in the Restatement (Second) of Conflict of Laws § 188, specifically "protection of justified expectations," and "certainty, predictability and uniformity of result." *Id.*

The Court's own conflict of laws analysis compels the same result. In diversity cases, such as this one, federal courts must apply the conflict of laws principles of the forum state.[12] *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Any choice of law analysis necessarily begins with the presumption that the Court will first look to the law of its own forum. *See Isuzu Motors Ltd., Consumers Union of U.S., Inc.*, 12 F. Supp. 2d 1035, 1043 (C.D. Cal. 1998) (reasoning that the law of the forum generally applies unless a party timely invokes the law of a foreign state). "If only one state has a legitimate interest in the application of its law, there is no real problem; the law of the interested state should control." *Rosenthal v. Fonda*, 862 F.2d 1398, 1402 (9th Cir. 1988) (citing *Hill v. Hill*, 193 Cal. App. 3d 1118 (Cal. Ct. App. 1987)).

California courts apply two different choice of law tests when examining a contract, one statutory, and the other a common law governmental interest test. *Frontier Oil Corp. v. RLI Ins. Co.*, 153 Cal. App. 4th 1436, 1459 (Cal. Ct. App. 2007), *as modified* (Sept. 5, 2007). Under the governmental interest analysis, courts first determine whether there is a conflict between the law of potentially concerned jurisdictions. *Id.* at 1454. If there is no conflict, courts may apply California law. *Id.* In the event of conflict, courts examine the interest of each jurisdiction in

---

[12] Flintkote argues that Delaware's choice of law rules apply to this transferred case. *See Muldoon v. Tropitone Furniture Co.*, 1 F.3d 964, 965 (9th Cir. 1993) ("[W]here such a transfer is granted at the behest of a defendant, the transferee court must follow the choice-of-law rules of the transferor court."). This principle plainly does not apply when a plaintiff (here, Flintkote) first filed in the transferor court (Delaware) to avoid the application of the law of the transferee court (this Court). *Cf. Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas*, 134 S. Ct. 568, 582-83 (2013) (rejecting the rule that the law of the court in which the plaintiff inappropriately filed suit should follow the case, because, "[n]ot only would it be inequitable to allow the plaintiff to fasten its choice of substantive law to the venue transfer, but it would also encourage gamesmanship"). The Delaware District Court identified Flintkote's forum shopping behavior when it transferred this case to this Court. *Flintkote Co. v. Aviva P.L.C.*, 2015 WL 1405922, at *5.

United States District Court
Northern District of California

having its own law applied to a particular dispute and engage in a "comparative impairment analysis" to determine which jurisdiction has a greater interest or more significant impairment if its own laws are not applied.  *Id.* at 1454-55.  The court must apply the law of the jurisdiction whose interest would be more significantly impaired if its laws were not applied.  *Id.* at 1455.

Here, Flintkote first argues that there is no conflict of laws, a premise the Court rejects,[13] and then argues, in effect, that *anything but* California law applies.  Dkt. 120 at 9, 23-30; Dkt. 148 at 13.  To this end, Flintkote suggests that Delaware has a more compelling interest in this case than California because Delaware is the state of its incorporation and provides "the controlling law of The Trust."  Dkt. 120 at 15; *see also* Dkt. 139-5 at 16-20.  The Court finds this argument unpersuasive for two reasons.

First, the dispute here concerns the interpretation of a payment obligation in insurance contracts entered into by the parties that significantly predate Flintkote's bankruptcy and the creation of the resulting trust.  How much Aviva is "obligated to pay" Flintkote has little to do with the Delaware law controlling The Trust's operation.  Rather, the Court must decide what law it should apply to interpret the *underlying* insurance contracts' payment obligation in light of Flintkote's bankruptcy and the payment percentage now paid to claimants.

Second, Flintkote unsuccessfully attempted to sway the Delaware District Court to keep this case before it on similar grounds, arguing that Delaware was "a more convenient and logical forum because it now is the location of its bankruptcy estate."  *See Flintkote Co. v. Aviva P.L.C.*, 2015 WL 1405922, at *5.  The Delaware Court rejected Flintkote's argument and transferred the case here.  *Id.*  In so doing the court found, as explained above, that there was "ample evidence" in the record to support a finding that Flintkote filed suit in anticipation of Aviva's forthcoming suit in the Northern District of California, and did so to avoid *Fuller-Austin*.  *Id.*  Second, it found that:

---

[13] In rejecting this assertion, the Court observes that Flintkote spent the majority of its briefing to this Court attempting to distinguish and thus dismiss the *Fuller-Austin* court's rationale as applicable to this dispute.  Dkt. 120 at 23-30; Dkt. 148 at 8-13; Dkt. 139-5 at 15-16, 23.  This exhaustive effort undermines its conflict of laws argument; in any event, the merits of the argument are not compelling for the reasons discussed below.

United States District Court
Northern District of California

> [E]ssentially all of the characteristics Flintkote cites as support for the convenience of this Court existed in 2009, when Flintkote nevertheless filed suit in the Northern District of California and argued in favor of the application of California law. At that time, Flintkote had already filed for bankruptcy in Delaware, had long ceased operating, and had already proposed to create a § 524(g) trust under Delaware law. This undermines Flintkote's argument that Delaware has become (or imminently will become) materially more convenient than previously.

*Id.*

The 2009 matter referenced above was a prior case between Flintkote and Aviva Insurance Company of Canada. *See* Northern District of California, Case No. 3:04-cv-01827-MHP, Dkt. 379.  Opposing Aviva's motion for an application of Canadian law, the same attorneys currently representing Flintkote persuasively argued:

> Proper application of California's choice-of-law rules shows that California substantive law governs. This Court has already told Aviva that "[c]ourts have frequently affirmed California's interest in assuring that insurance obligations to business operating in this state are honored and that injuries sustained in this state are redressed." *Flintkote Co. v. General Accident Assur. Co.*("*Flintkote I*"), 2004 WL 1977220, *5 (N.D. Cal. Sept. 7, 2004).  Flintkote is headquartered in California, there are thousands of pending claims in California (in addition to many thousands of resolved claims), California law is extremely well-developed on asbestos insurance coverage issues, and Aviva acknowledges litigation with other insurers which was in California and decided under California law.

*Id.* at 9.

This Court is convinced by Flintkote's 2009 argument pursuant to California's governmental interest test.  Flintkote is headquartered in California.  Dkts. 110 at 2-3; 139-5 at 16:3.  California appears to be the principal location of the insured risk.  Dkt. 110 at 2; *see, e.g.*, *Flintkote Co. v. Am. Mut. Liab. Ins. Co.*, 103 A.D.2d 501, 507 (N.Y. App. Div. 1984) *aff'd*, 492 N.E.2d 790 (N.Y. 1986) ("Not only would the State that is the principal location of the insured risk have the greatest interest in determining the issues arising under the insurance contracts, but the parties would naturally expect the law of that State to apply[.]").  Many of the asbestos-related cases brought against Flintkote were brought in California courts.  *See Flintkote Co. v. Gen. Acc. Assur. Co. of Canada*, 2004 WL 1977220, at *1 (N.D. Cal. Sept. 7, 2004).  California has a clear interest in the resolution of this dispute.  *See Clemco Indus. v. Commercial Union Ins. Co.*, 665 F. Supp. 816, 818 (N.D. Cal. 1987) *aff'd*, 848 F.2d 1242 (9th Cir. 1988) ("California has a very strong interest in regulating insurance contracts entered into with its own residents[.]"); *Nelson v. Flintkote Co.*, 172 Cal. App. 3d at 735 ("[California] certainly has an interest in protecting innocent asbestosis

United States District Court
Northern District of California

victims from toxic tortfeasors. Asbestosis may take up to 35 years to develop from first exposure.").

Relatedly, the Court is convinced that the intent behind the Wellington Agreement, as highlighted by Flintkote, is best served by following the parallel arbitration proceedings so as to uniformly apply California law to these policies.  *See* Dkt. 120 at 15; Dkt. 119-7 (arbitrator's decision applying California law to this dispute).  As the architect of the Wellington Agreement testified, claims resolution under the Agreement "should be uniform because there is a facility, rather than numerous jurisdictions in which lawsuits might be tried with differing results." *Proposed Asbestos Claims Facility: Hearings before the Subcomm. on Labor of the Senate Comm. on Labor and Human Resources*, 99th Cong. Rec. 25 (1985) (statement of Harry H. Wellington, Dean, Yale Univ. L. Sch.).  Further, the 1989 Agreement between the parties provides that, "All interpretations of this Agreement *shall be consistent* with interpretations of the Wellington Agreement as adopted by the Facility."  Dkt. 120 at 18, 20 (referencing 121-2 at IV.) (emphasis added).

California law applies to this proceeding.

## II.    Fuller-Austin Squarely Dictates What Aviva is "Obligated to Pay" Flintkote

*Fuller-Austin* addresses the issue before this Court:  an insurer's indemnity obligation to its insured's §524(g) trust.[14]  *See Fuller-Austin*, 135 Cal. App. 4th at 997.  Both Flintkote and Fuller-Austin faced liability for asbestos bodily injury claims from exposure to their products up until the

---

[14] Flintkote unpersuasively argues that other California cases overrule in part, or diminish the effect of, *Fuller-Austin*.  *See* Dkt. 120 at 22, 24; Dkt. 148 at 16-17 (citing *Fluor Corp. v. Superior Court*, 61 Cal. 4th 1175, 1216 (Cal. 2015) ("[A]n insured loss occurs or happens *at the time of injury* during the policy period, and well before there might be any judgment or approved settlement for a sum of money[.]" (emphasis added)); *Powerine Oil Co. v. Superior Court*, 37 Cal. 4th 377, 403 (Cal. 2005) (concluding that a "'loss payable' clause . . . . speaks to the *timing* of the excess insurer's obligation to indemnify in relation to the exhaustion of underlying primary policy limits" (emphasis added) (citations omitted)).
These cases discuss the *timing* of an insurer's payment obligation, not *what* that payment obligation actually is. What Aviva is legally "obligated to pay" pursuant to the contract between the parties, in light of Flintkote's status as a §524(g) trust, is directly addressed in *Fuller-Austin*.

mid-1980s.  *Id.* at 966-67.  Both filed for bankruptcy protection and proposed a plan of reorganization under §524(g) of the Bankruptcy Code.  *Id.* at 968.  Fuller-Austin's insurers, like Aviva, objected to the plan of reorganization to the extent it sought to impair the insurers' rights under their policies.  *Id.* at 970.

Like the Flintkote Plan, the Fuller-Austin plan provided that its trust would evaluate and determine whether to pay claims under that plan's version of the TDPs, called the "Claims Resolution Procedures" ("CRPs").  *Id.* at 969-70.  "The claimant could either accept the Trust's determination or seek a different ruling through binding or nonbinding arbitration, or a jury trial." *Id.* at 970.  The CRPs, like the Flintkote TDPs, provided "allowed liquidated values" for five asbestos-related disease levels.  *Id.* at 969-70.  "The CRP[s] expressly provided that a claimant would receive only a periodically adjusted 'Payment Sum Percentage' of the [allowed liquidated value], based on the Trust's assets, that would amount to only a fraction of the [allowed liquidated value]."  *Id.* at 970.

The Fuller-Austin policies also provided that the insurers would "indemnify the Assured for all sums which the Assured shall be *obligated to pay* by reason of liability (a) imposed upon the Assured by law … for damages, direct or consequential and expenses, all as more fully defined by the term 'ultimate net loss'[.]"  *Id.* at 991-92 (emphasis added).  The policies defined "ultimate net loss" as "the total sum which the Assured, or any company as his insurer, or both, become *obligated to pay* by reason of personal injury, property damage or advertising liability claims, either through adjudication or compromise[.]"  *Id.*

The trial court in *Fuller-Austin* initially accepted the argument Flintkote advances here — that the insurers were obligated to indemnify Fuller-Austin for the allowed liquidated value of each claim, not the payment sum percentage that Fuller-Austin actually paid each claimant.  *Id.* at 996.  The California Court of Appeal reversed this ruling, recognizing that the "policies indemnify Fuller-Austin for amounts it is 'obligated to pay' by law."  *Id.* at 997.  And, according to the court, the CDPs established that the only amount that Fuller-Austin was obligated to pay was each claim's payment percentage — not the allowed liquidated value.  *Id.*  The court reasoned that, "The [allowed liquidated value] serves only as a model of what would be paid under the best case

scenario, assuming that the payment . . . percentage reached 100 percent. While premising appellants' indemnity obligations on the basis of a best case scenario may comport with a strong public policy to compensate victims of asbestos exposure, public policy may not be used to redefine the scope of coverage." *Id.*

Flintkote argues that The Flintkote Trust is factually distinguishable from the trust in *Fuller-Austin*. It advances what appear to be three arguments, all saying substantially the same thing. First, Flintkote argues that there is no language in *Fuller-Austin* directly connecting insurance proceeds to greater claim benefits. Dkt. 148 at 6. Second, Flintkote asserts that the discretion of Flintkote's Trustees is severely circumscribed by the Flintkote TDPs, as the insurance recoveries "must" go to the benefit of claimants. *Id.* at 7. Third, Flintkote argues that its plan "contains a direct connection between insurance recoveries and payment percentage" for the benefit for claimants, unlike the plan in *Fuller-Austin*. *Id.* at 8.

It appears to the Court that the Fuller-Austin CRPs employed the same mechanism as The Flintkote Trust TDPs; that is, the procedure increased the payment percentage *if* the Trustees determined it was appropriate based on a similar set of factors, including the recovery of additional assets. *Compare* Dkt. 121-4 at §§ 2.3, 4.2 *with Fuller-Austin*, 135 Cal. App. 4th at 999-1000. Fuller-Austin's petition for writ of certiorari to the United States Supreme Court explained, "the Plan expressly authorizes increases in victim payments *if* more assets become available to the Fuller-Austin Trust: '[T]he Trustees *have the power* to alter the Payment Sum Percentage … as well as the power to increase the Allowed Liquidated Value for any Asbestos-Related Disease Category.'" *Fuller-Austin Insulation Co. v. Highlands Ins. Co.*, 2006 WL 2055468 (U.S.), 21 (emphasis added). Similarly, The Flintkote Trust TDPs provide that, "The Payment Percentage *may* . . . be adjusted upwards or downwards from time to time . . . with the consent of the [Trust Advisory Committee] and the Future Claimants Representative to reflect then-current estimates of the Trust's assets and liabilities, as well as the then-estimated value of pending and future claims." Dkt. 121-4 at § 2.3 (emphasis added). Contrary to what Flintkote represents to this Court, The Flintkote Trust TDPs do not severely circumscribe the discretion of Flintkote's Trustees, mandating that insurance recoveries "must" go to the benefit of claimants. *See* Dkt. 148 at 7.

United States District Court
Northern District of California

1    Rather, the language clearly provides that, once every three years, "the Trustees shall reconsider

2    the then applicable Payment Percentage to assure that it is based on accurate, current information

3    and *may*, after such reconsideration, change the Payment Percentage if necessary, with the consent

4    of the [Trust Advisory Committee] and the Future Claimants Representative." Dkt. 121-4 at § 4.2

5    (emphasis added).

6        Interestingly, the Fuller-Austin CRPs called upon the Trustees to examine the payment

7    percentage no less than once per year, Dkt. 142-3, § 3.1 at 97-98, while the Flintkote TDPs call for

8    examination once every three years. Dkt. 121-4 at §§ 2.3, 4.2. The Fuller-Austin CRPs also

9    allowed for supplemental payments to past claimants if the payment percentage subsequently

10   increased, just like Flintkote's TDPs. Dkt. 142-3 at § 4.3(l).  The Fuller-Austin CRPs expressly

11   stated the "overarching goal" was to maximize value for ASBI claimants, dkt. 142-3, §1.4 at 96,

12   just as Flintkote's TDPs.

13       The arbitrator in the parallel Wellington Agreement proceeding reached the same

14   conclusion, finding that he had "no basis on which to distinguish *Fuller-Austin*

15   . . . by finding that 'greater insurance recovery would . . . protect or benefit claimants." The

16   arbitrator added that there was no basis for concern about the insurers receiving a "windfall"

17   either, as "the parties agree that the applicable aggregate policy limits will be exhausted sooner or

18   later[.]" Dkt. 119-7.

19       The Court finds that *Fuller-Austin* determines the "obligated to pay" issue, and that Aviva

20   is accordingly obligated to pay Flintkote the trust payment percentage, not the liquidated value.

21       The Court also rejects Flintkote's assertion that Aviva has somehow contractually waived

22   the argument that it is only required to pay the trust payment percentage.  See Dkt. 120 at 20-21.

23   As outlined above, section VIII.5 of the Wellington Agreement (which is not in the 1989

24   Agreement between the parties) provides:

25       [E]ach Subscribing Insurer shall waive and permanently abandon and shall not
         assert or apply any conditions or defenses based upon, or exclusionary provisions
26       contained in, insurance policies, which defenses or provisions have the effect of
         reducing or denying insurance coverage available under any of the insurance
27       policies issued by the Subscribing Insurers to Subscribing Producers.

28   Dkt. 121-2, § VIII.5.

Insurers in the Wellington Agreement waived defenses based on "conditions" or "exclusionary provisions." There exists a clear distinction between coverage defenses based on exclusionary language or conditions, and the *scope* of the insuring agreement. *See, e.g., Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 32 (Cal. 1995); *Ringler Associates Inc. v. Maryland Cas. Co.*, 80 Cal. App. 4th 1165, 1189 (Cal. Ct. App. 2000); *Alta Cal. Reg'l Ctr. v. Fremont Indem. Co.*, 25 Cal. App. 4th 455, 459, 30 Cal. Rptr. 2d 841, 842-43 (Cal. Ct. App. 1994) (discussing distinction between assertion of lack of coverage and coverage limiting terms under the policy). In other words, this dispute concerns the scope of the agreed-upon coverage, not a defense to that coverage.

The arbitrator in the parallel Wellington Agreement proceeding reached the same conclusion, finding that, "Wellington's waiver language, § VIII(5), does not support Flintkote's position. Limiting the insurers obligation to what the trust actually pays out implicates no 'coverage defense' or 'exclusion.'" Dkt. 119-7 at 5.

## III.    Defendants Must Post a Bond

Now that the Court has decided *what* Aviva must pay Flintkote, it must decide whether to impose a bond on Aviva sufficient to secure the payment of any final judgment which may be rendered. The Court finds that a bond in this case is appropriate.

California Insurance Code section 1616 provides:

> Before any nonadmitted foreign or alien insurer shall file *or cause to be filed* any pleading in any action, suit or proceeding instituted against it, the insurer shall either (1) procure a certificate of authority to transact insurance in this state; or (2) give a bond in the action, suit or proceeding in an amount to be fixed by the court sufficient to secure the payment of any final judgment which may be rendered in the action, suit, or proceeding.

Aviva indisputably caused this action to be filed in the Northern District of California, as it successfully moved the Delaware District Court to transfer this matter here. *See Flintkote Co. v. Aviva P.L.C.*, 2015 WL 1405922, at *5. All of the alleged insurers are foreign U.K. entities.[15]

---

[15] The Court notes that defendants argue that Aviva PLC is not an insurer, but a holding company. Dkt. 136 at 6-7. As the Court made clear in its prior order, in light of the years-long mistake in identifying the actual successor insurer to CU UK, "[i]t is evident . . . that there is some

Dkt. 110 ¶ 7. Aviva has specifically conceded that Ocean Marine, which is now claimed to be the only true successor to CU UK (the London-based insurance company that originally issued asbestos liability insurance policies to Flintkote), dkt. 119-4 at 5 n.2, is not an admitted surplus lines carrier in California. Dkt. 114-1 at 2. Aviva has not produced a certificate of authority for any of the defendants in this action.

California case law is clear that "Insurance Code section 1616 is *mandatory*," and a trial court has no discretion to waive it. *Lorenz v. Commercial Acceptance Ins. Co.*, 40 Cal. App. 4th 981, 995-96 (Cal. App. 1995) (emphasis in original); *see also Bank of San Pedro v. Forbes Westar, Inc.*, 53 F.3d 273, 275 (9th Cir. 1995), *as amended* (May 30, 1995) ("[California Insurance Code section 1616] is part of [California's] regulatory scheme. To disregard it would be to damage the mechanism by which California regulates insurance . . . . [W]e apply the requirement.").

Aviva nonetheless argues that section 1616 does not apply to this case, because the exception contained in California Insurance Code section 1620(a) applies. Dkt. 135-4 at 7*; See Ludgate Ins. Co. v. Lockheed Martin Corp.*, 82 Cal. App. 4th 592, 611 (Cal. App. 2000). The text of section 1620(a) states, "The provisions of the preceding sections of this article shall not apply to any . . . proceeding against any unauthorized foreign or alien insurer . . . if the contract is *governed by* and *complies with* the laws of the state in which the contract was entered." (Emphasis added). Aviva offers a convoluted explanation of the history of the policies, then concludes: "the policies were entered either in London, England or Canada — in either event, the exception in § 1620(a) to the bonding requirement applies." Dkt. 135-4 at 8. Aviva also asserts "Flintkote has never argued and no court has ever held that the policies are non-compliant with English or Canadian insurance

---

uncertainty as to who the proper defendant in this case should be." Dkt. 107 at 6. Defendants are presently jointly responsible for the bond amount levied; should Aviva PLC or Aviva International Insurance, Ltd. seek dismissal from this cause of action, counsel must file the appropriate motion seeking summary adjudication as to these individual defendants. The Court is aware that "[i]t is elementary that a defendant is not liable on the bond if he is not a party to it . . . and judgment may be entered only against those sureties who are named as defendants in the complaint[.]" *Russell v. United Pac. Ins. Co.*, 214 Cal. App. 2d 78, 91-92 (Cal. Ct. App. 1963) (citations omitted).

United States District Court
Northern District of California

regulatory requirements for the procurement or issuance of policies[.]"  *Id.*  As the party seeking the exception, however, it is incumbent on Aviva to proffer some affirmative evidence that the policies are, in fact, compliant.  Even if "England" or "Canada" could properly be considered a "state" under the statute, there remains the fact that the Court has found — at Aviva's urging — that California law governs interpretation of the contract.

Finally, Aviva contends that, should the above exception to section 1616 not apply, then California Insurance Code section 1620(b)(1) applies, and it has made a sufficient showing that it maintains in the United States funds sufficient to satisfy a final judgment.  Dkt. 135-4 at 10-12.

California Insurance Code section 1620(b)(1) provides that,

> In any action, suit, or proceeding arising out of any such contract of insurance [as delineated in previous sections], the court *may* require the insurer to file a bond . . . unless . . . [t]he insurer makes a showing satisfactory to the court that it maintains in a state of the United States funds or securities in trust or otherwise, sufficient and available to satisfy any such final judgment and that it will pay the judgment without requiring suit to be brought thereon in the state where the securities or funds are located.

This section applies where California Insurance Code section 1616 does not apply.  *See Ludgate Ins. Co.*, 82 Cal. App. 4th at 611 (finding that where "the bond requirement of section 1616 does not . . . apply, section 1620, subdivision (b), nonetheless gives the trial court discretion to require the nonadmitted alien insurer to put up such a bond").

Here, the bond requirement of section 1616 does apply.  The Court is compelled both by the clear wording of California Insurance Code section 1616, and the supporting, unequivocal case law directly on point.  *See Lorenz v. Commercial Acceptance Ins. Co.*, 40 Cal. App. 4th 981, 995-96 (Cal. Ct. App. 1995) (reasoning that the statute is clear and the bond is mandatory); *see also Trihedron Internat. Assurance, Ltd. v. Superior Court*, 218 Cal. App. 3d 934, 947 (Cal. Ct. App. 1990) ("Here, when a case arises out of a non-admitted foreign or alien insurer transacting insurance in California, the state has a valid interest in *forcing* the insurer to comply with the states certification requirements thereby protecting California insureds and beneficiaries. Section 1616 in the first instance requires compliance with those certification requirements. The statute provides the insurer with the generally less onerous alternative of posting a bond in lieu of meeting the certification requirements." (emphasis added)).

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Because the Court will require that a bond be posted, the issue then becomes fixing an appropriate amount.  The parties have put forth widely disparate figures: Flintkote believes that the bond should be $15 million, while Aviva asserts the bond should be $2 million.  Dkt. 123 at 13; Dkt. 135-4 at 13.  A review of Flintkote's recently filed Second Amended Complaint shows that the majority of the disputes between the parties involve declarations as to obligations under the relevant insurance policies as The Trust begins to operate and pay covered ASBI claims.  Dkt. 110 at 17-19.  Here the Court has decided one aspect of Aviva's obligation to Flintkote; namely, that Aviva is obligated to pay Flintkote the trust payment percentage.  Given the new information contained in this order, the Court orders the parties to meet and confer and to each file a statement of no more than five (5) pages on an appropriate bond amount sufficient to cover a judgment in this case.  If the parties still cannot reach comparable figures the Court will order a bond amount, noting that, prior to this order, Aviva admitted that its "potential obligations under all of the Policies total just under CAN$15 million in policy limits[.]"  Dkt. 111 at 9.

## CONCLUSION

Pursuant to California law, Aviva's coverage obligation is based on the payment percentage amount The Trust actually pays to claimants.  Given this information, the Court orders the parties to meet and confer and to each file a statement of no more than five (5) pages on an appropriate bond amount sufficient to cover a judgment in this case **by April 22, 2016**.

///

///

Accordingly, the Court DENIES Flintkote's motion for a declaration of the parties' rights regarding trust payments, GRANTS Aviva's motion for partial summary judgment, and GRANTS Flintkote's motion for a bond.[16]

**IT IS SO ORDERED**.

Dated:  April 4, 2016

SUSAN ILLSTON
United States District Judge

United States District Court
Northern District of California

_____

[16] The timing of the payment obligation, how the payment of defense costs impacts the remaining policy limits, and whether certain trust expenses are covered defense costs are issues for later resolution.  The Court encourages the parties to attempt to reach an amicable solution on these and other issues.